# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON  DIVISION

| | | |
|---|---|---|
| **MARY A. COLLINS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:06CV00059 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By:  James P. Jones |
| **COMMISSIONER OF SOCIAL** | ) | Chief United States District Judge |
| **SECURITY**, | ) | |
| | ) | |
| Defendant. | ) | |

*S.F. Raymond Smith, Rundle and Rundle, L.C., Pineville, West Virginia and M. Hudson McClanahan, Brewster, Morhous, Cameron, Caruth, Moore, Kersey & Stafford, PLLC, Bluefield, West Virginia, for Plaintiff; Sara Bugbee Winn, Assistant United States Attorney, Roanoke, Virginia, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

## I

Mary A. Collins filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2007) ("Act").  Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, the court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff protectively filed for DIB on June 27, 2003, alleging disability beginning September 1, 2002, due to a back injury she had sustained at work. (R. at 60, 67-76.) Her application was denied initially on April 27, 2004 (R. at 33-37), and upon reconsideration on August 6, 2004 (R. at 43-45). At her request, the plaintiff received a hearing before an administrative law judge ("ALJ") on November 14, 2005. (R. at 241-272.) The plaintiff, who was present and represented by counsel, testified at this hearing. (*Id.*) By decision dated January 20, 2006, the ALJ denied the plaintiff's claim for DIB. (R. at 11-30.)

The plaintiff filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council. (R. at 10.) On February 24, 2006, the Appeals Council denied the plaintiff's request for review. (R. at 6-8.) Thus, the ALJ's opinion constitutes the final decision of the Commissioner. The plaintiff then

filed a complaint with this court on May 1, 2006, objecting to the final decision of the Commissioner.

The parties have filed cross motions for summary judgment and have briefed the issues. The case is now ripe for decision.

## II

The summary judgment record reveals the following facts. The plaintiff was fifty years old at the time of the ALJ's decision, making her an individual "closely approaching advanced age" under the Commissioner's regulations. *See* 20 C.F.R. §§ 404.1563(d) (2007). She has a high school education and an associate's degree in nursing. (R. at 132.) From 1991 to 2002, she worked as an intensive care nurse at St. Luke's Hospital in Bluefield, West Virginia.[1] On September 1, 2002, she injured her back while transferring a patient from one bed to another. (R. at 248.) She tried to return to work on September 18, 2002, but was only able to work for one day and has not worked since. (R. at 68.)

---

[1] Although a Virginia resident, the plaintiff filed a claim for workers' compensation benefits in West Virginia, her state of employment. She received a permanent partial disability award in December 2003 that was still being litigated at the time of the hearing before the ALJ. (R. at 250-51.)

The plaintiff was initially treated by Harold Cofer, M.D.  Dr. Cofer ordered an MRI of her thoracic and lumbosacral spine that was conducted on September 4, 2002. (R. at 170.)  The MRI revealed mild degenerative disc disease at several mid-thoracic levels, minimal thoracic scoliosis, and mild disc space narrowing at T12-L1 and L4-5, probably indicative of degenerative disc disease.  (*Id*.)

Another MRI of the lumbar spine was conducted on September 19, 2002.  (R. at 140.)  This MRI indicated some disc bulging but no evidence of nerve root distortion, extruded disc material, or foraminal encroachment.  (*Id*.)

The plaintiff then began seeing Yogesh Chand, M.D., an orthopedic specialist. In his report of the plaintiff's first visit on September 30, 2002, Dr. Chand noted that the plaintiff complained of tenderness on the thoracic spine and lower back.  (R. at 165.)  He found that the neurological function of the plaintiff's legs was normal and that she had no weakness.  (*Id*.)  He diagnosed her with a disc herniation at the L5 sacral level with radiculopathy in the left leg, a sprain of the low back, and a disc injury.  (R. at 166.)  He recommended physical therapy, acupuncture and an EMG nerve conduction study of the left leg.  In addition, he prescribed medication to treat her pain and muscle spasms and suggested that she not return to work for six weeks. (*Id*.)

On October 14, 2002, the plaintiff returned to Dr. Chand. During this visit, Dr. Chand observed that the plaintiff was responding to physical therapy and stated that she could return to a light duty job if her employer would allow her to do so. (R. at 161.) During a follow-up visit a few weeks later, Dr. Chand opined that the plaintiff had some form of neurologic pressure in her lower back but that the neurologic function of her legs and her gait was normal. (R. at 160.) Dr. Chand indicated in his notes that he had requested authorization from the Workers' Compensation Division to do an EMG nerve conduction study of the left leg but that he was not sure what had happened with that request. (*Id*.)

On January 9, 2003, Dr. Chand wrote to the Claims Management Office of the West Virginia Bureau of Employment Programs reiterating his request for authorization to do an EMG nerve conduction study. (R. at 158-159.) In this letter, Dr. Chand stated that the plaintiff was complaining that her condition was deteriorating and that she wanted to be transferred to Dr. Schmidt or Dr. Crow at the Charleston Area Medical Center. (*Id.*) He further stated that there was a poor prognosis that the plaintiff would return to her job as a regular nurse and would need to go to a modified workplace where she did not have to perform moderate to heavy lifting, tugging, frequent bending, stooping, or squatting. (R. at 159.)

-5-

The plaintiff did begin seeing John Schmidt, M.D., on February 3, 2003. During this initial examination, Dr. Schmidt observed that the plaintiff had normal strength in her upper and lower extremities. (R. at 142-43.) He detected no atrophy or fasciculations or abnormal movements in the extremities. (*Id*.) Dr. Schmidt also reviewed the lumbar spine MRI and described it as "generally unremarkable but for the bulging disc at L4-5 and at the L1-2 level . . . ." (*Id*.) He stated that her gait and station were unremarkable and that she showed no signs of acute distress. (*Id*.) He diagnosed her with chronic musculoskeletal mechanical back strain and noted the possibility of a left L5 radiculitis despite a lack of mechanical signs. (*Id*.) He suggested that the plaintiff follow up with the pain clinic, have another MRI of the lumbar spine to rule out a ruptured disc, and undergo a cervical study. (*Id*.)

Another MRI was conducted on March 19, 2003, at Community Radiology. Stephen P. Raskin, M.D. compared this MRI with the September 19, 2002, MRI and opined, "The MR myelogram is unremarkable and unchanged." (R. at 139.) More specifically, he reported that there were several levels of disc bulging that were unchanged from September 2002, and that there were no herniated disc fragments or areas of spinal stenosis. (*Id.*)

The plaintiff was treated by Dr. Chand on March 10, 2003. She told Dr. Chand that the physical therapy had not helped but that she had no weakness in her legs. (R.

at 157.) Dr. Chand recommended that she begin receiving epidural steroid injections, that she continue taking medication for pain and muscle spasms, and that she not return to her regular job for three months because it required heavy lifting. (*Id*.) Similarly, at the plaintiff's next appointment on April 28, 2003, Dr. Chand examined the plaintiff and recommended that she continue taking the same medication and that she remain off work for another three months. (R. at 156.) He also indicated that he would make a request to the Workers' Compensation Division that her thoracic sprain be a recognized diagnosis. (*Id*.) At an appointment on June 9, 2003, Dr. Chand indicated that he had still not received authorization for the EMG study and the epidural steroid injections. (R. at 155.) He recommended that the plaintiff continue taking her medication and that she remain on disability for another three months since she had not yet reached maximum improvement. (*Id*.)

After Dr. Chand examined the plaintiff on August 18, 2003, he recommended that she not return to her regular job for six more weeks, but stated that she may "pursue light-duty work and vocational rehabilitation at any time." (R. at 154.)

The plaintiff was treated by her primary care doctor, Thomas Brinegar, D.O., on September 3, 2003. (R. at 223-26.) Dr. Brinegar prescribed Zoloft for her depression. (R. at 226.) A few months later, she returned to Dr. Brinegar and stated that the Zoloft was working well. (R. at 225.)

-7-

At the request of the Workers' Compensation Division, the plaintiff underwent a consultative evaluation on October 28, 2003, with Robert Kropac, M.D., an orthopedic specialist. (R. at 207-11.) The plaintiff told Dr. Kropac that she had constant lower back pain that increased with bending, stooping, motion, standing, and walking. (R. at 208.) She further stated that she had pain in her left hip, occasional numbness in the left lower extremity with walking and standing, urinary incontinence, neck pain, knee pain, and crepitation in both knees. (*Id*.)

During the evaluation, Dr. Kropac found no significant abnormalities. (R. at 207-11.) He indicated that there was no evidence of any atrophy, no sciatic notch tenderness, no evidence of any significant scoliosis, and no soft tissue swelling, erythema or deformity in the knees. (R. at 209.) He also reported that the plaintiff had normal strength on manual motor strength testing of the right and left lower extremities and a full range of motion of all joints in the lower extremities. (*Id.*) Dr. Kropac also reviewed the MRI scans from September 19, 2002, and March 19, 2003, and observed that they revealed no disc herniation. (R. at 210.) Ultimately, he diagnosed her with a lumbosacral musculoligamentous strain, and recommended that she continue on medical maintenance care with the use of anti-inflammatory, analgesic, and muscle relaxant medications. (*Id.*) Dr. Kropac further recommended that the plaintiff see a vocational rehabilitation specialist for an assessment and a

-8-

psychiatrist for evaluation and treatment of her "anxiety and depression arising out of her workers' compensation condition." (*Id.*)

The plaintiff was re-evaluated by Dr. Kropac on December 2, 2003, and on February 3, April 2, and June 2 in 2004. (R. at 199-206.) After each visit, Dr. Kropac reported to Workers' Compensation Division that the plaintiff suffered from a lumbosacral musculoligamentous strain, patellofemoral chondromalacia in the left and right knees, and a lower thoracic strain. (*Id.*) He consistently recommended that the plaintiff continue on anti-spasmodic, anti-inflammatory, and pain medications, and reiterated his request for authorization for medications and for the plaintiff to see a psychiatrist. No other treatment was recommended. (*Id.*)

The EMG nerve conduction study that Dr. Chand requested several times was eventually performed in August 2004. The study showed "mild abnormal spontaneous activity in the form of fibrillation potentials and positive sharp waves in the lower and mid-lumbar paraspinals as well as the quadriceps muscle, mainly on the left side." (R. at 219-20.) The doctor conducting the study opined that the results suggested possible chronic L4 radiculopathy. (R. at 220.)

Meanwhile, the plaintiff was also evaluated and treated for her psychological conditions. The plaintiff had a history of mental illness prior to her back injury. According to the summary judgment record, she was diagnosed with major

depression, in the form of a single episode of relatively severe proportion in December 1997. (R. at 136.)  This diagnosis was made by Twyla McGuire Hersman, a licensed professional counselor. In a letter to the plaintiff's primary care physician dated December 17, 1997, Hersman stated, "[the plaintiff] certainly recognizes that she has some long standing issues that will need to be addressed in therapy.  She appears motivated to do so and will be seen initially on a weekly basis." (*Id.*)  This treatment did not affect the plaintiff's employment.  (R. at 16.)

Several years later and following her back injury, the plaintiff was evaluated by Tonya McFadden, M.A., a licensed psychologist, at the request of the Virginia Department of Rehabilitative Services.  (R. at 171-76.)  McFadden met with the plaintiff on March 8, 2004.  In her report, McFadden stated that the plaintiff's speech was coherent, that there was no evidence of distorted thought processes, delusions or hallucinations, and that the plaintiff listed several activities she performed daily including driving her grandchild to school, washing laundry, cleaning, moping, and grocery shopping, among others.  (R. at 173, 175.)  McFadden also noted that the plaintiff was ambulating in a normal manner even though she had driven herself twenty-eight miles to get to the examination.  (R. at 171.)

McFadden opined that the plaintiff appeared severely depressed but that she did not present suicidal or homicidal ideation. (R. at 175.)  McFadden ultimately

-10-

diagnosed the plaintiff with major depressive disorder of a severe and recurrent type and suggested that the plaintiff's prognosis was "[f]air with appropriate treatment." (R. at 176.)   Based on this diagnosis and prognosis, McFadden suggested that the plaintiff could perform simple and repetitive tasks as well as detailed and complex tasks but that her depressive state prevented her from performing work-related tasks on a consistent basis.   (*Id.*)   McFadden also reported that the plaintiff's poor concentration and memory problems may prevent her from accepting instructions from a supervisor. (*Id.*)

The plaintiff was then examined by a psychiatrist, Ghassan Bizri, M.D., on May 28, 2004.  (R. at 217-18.)  She had been referred to Dr. Bizri by Dr. Kropac.  Dr. Bizri disagreed with McFadden's diagnosis; he found that the plaintiff's memory and cognition were intact and diagnosed her with moderate major depressive disorder, in the form of a single episode.  (R. at 218.)  Dr. Bizri increased her anti-depressant medication and noted that she would begin psychotherapy.  (*Id.*)  The plaintiff returned to Dr. Bizri on June 9 and June 23, 2004.   During both visits, the plaintiff told Dr. Bizri that she was feeling better.  (R. at  215-16.)

John Terry, M.S., a licensed psychologist, evaluated the plaintiff on June 21, 2004, at the Bridgewater Clinic.  (R. at 212-14.)  The plaintiff told Terry that her depression developed when she realized that she was not improving and that she

-11-

would not be able to return to her former lifestyle and work as an ICU nurse. (R at 212.) Terry noted in his report that the plaintiff's speech was coherent but that her affect was tearful and her mood was depressed. (R. at 213.) He stated that her suicidal ideation was fleeting and occasional and that she had informed him that the medication prescribed by Dr. Bizri was "helping her a lot." (R. at 213, 215.) He did not assess her cognitive functions, but did observe that the plaintiff's depression seemed to be more related to her change in lifestyle than the intensity of the physical pain itself. (R. at 213.) He reported that the plaintiff "previously placed a great deal of her self-worth in how much work she can get accomplished in the course of the day and that has changed dramatically." (*Id*.) Terry diagnosed the plaintiff with moderate to severe major depression in the form of a single episode. (R. at 215.) He suggested that she be continued on her medication and requested authorization for ten outpatient psychotherapy visits. (R. at 214.)

The plaintiff was then evaluated on August 20, 2004, by clinical psychologist Dreama Baker, M.A., at the request of the Workers' Compensation Division. (R. at 227-31.) The plaintiff informed Baker that she had not taken her medication in a month because the Workers' Compensation Division had not authorized her to go back for additional psychiatric treatment with either Dr. Bizri or Terry. (R. at 230.) After administering a Personality Assessment Inventory, Baker recommended that the

-12-

Workers' Compensation Division authorize further treatment and that the plaintiff be evaluated for suicide risk. (R. at 231.)

The Workers' Compensation Division requested another evaluation that was conducted on September 28, 2004, by M. Khalid Hasan, M.D., a neurologist and psychiatrist. (R. at 232-36.) Dr. Hasan reported that the plaintiff's speech was clear and her affect appropriate. (R. at 234.) He rated her insight, judgment, and problem solving abilities as "fair." (*Id.*) In addition to interviewing the plaintiff, Dr. Hasan reviewed the records from Baker, Dr. Bizri, Terry, Dr. Kropac, and Dr. Victor Poletajev, a chiropractioner. (R. at 235.) He diagnosed the plaintiff with adjustment disorder accompanied by an anxious and depressed mood, which was secondary to physical illness and situational factors, and depressive disorder. (*Id.*) He opined that the plaintiff was "not disabled from a purely psychiatric point of view as a result of her compensable injury," that she was still depressed and anxious, and needed continued outpatient treatment from Dr. Bizri and Terry. (*Id.*) Dr. Hasan also opined that the plaintiff had not reached the maximum benefit from a psychiatric point of view and that she should increase her psychosocial and physical activities. (R. at 235-36.) Finally, Dr. Hasan noted that the plaintiff's impairment was likely to be progressive and that vocational rehabilitation services should be explored, but that he felt that her motivation was rather poor. (R. at 236.) As Dr. Hasan explained,

-13-

"[the plaintiff] feels she cannot work. I feel this should be addressed, as she is only 48 and a nurse by profession."  (*Id*.)

At the hearing on November 14, 2005, before the ALJ, the plaintiff testified that she still had pain in her lower back at her waist, across her hips, her upper back, in her knees, and down her left leg.  (R. at 251-52.)  When questioned by the ALJ, the plaintiff admitted that she had a current driver's license and still drove, but only short distances. (R. at 255.)[2]  She stated that she was able to perform several household chores such as doing laundry, cooking, taking care of her small dog, dusting, and grocery shopping for light items.  (R. at 254-55.)

A vocational expert also testified at this hearing.  When asked by the ALJ whether the plaintiff's skills were transferable to other types of work, the expert replied that the plaintiff could work as an office nurse, a skilled light job, or as a nurse consultant, a skilled sedentary job. (R. at 265.)

The ALJ also asked the vocational expert to consider whether jobs existed in significant numbers for a hypothetical person of the same age as the plaintiff with the same education, background, and physical and mental limitations.  The ALJ's description of the plaintiff's physical abilities included the ability to lift up to twenty

---

[2]  However, as stated previously, the record shows that plaintiff has been able to drive rather long distances including twenty-eight miles for an evaluation with McFadden. (R. at 171.)

-14-

pounds occasionally or up to ten pounds frequently, to sit or stand for only six hours in an eight-hour work day, and to occasionally climb stairs, balance, stoop, kneel, or crawl. (R. at 266.) He described the plaintiff as having a moderate limitation in her ability to understand, remember, and carry out detailed instructions, and to maintain attention and concentration for extended periods. (R. at 268.)

The vocational expert responded with a representative sampling of jobs that this hypothetical person would be able to perform, which included kitchen or laundry worker, both unskilled light jobs, or order clerk or information clerk, both sedentary jobs. (R. at 269-70.)

At the time of the hearing, the plaintiff's claim for workers' compensation benefits, filed in West Virginia, was still in dispute. (R. at 251.) She had received a permanent partial disability award in December 2003, but during the hearing she testified that she was not receiving any benefits and that she had authorization only for medication and not for treatment. (R. at 250-51.)

## III

My review is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision, and whether the correct legal standard has been applied. 42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517

(4th Cir. 1987). If substantial evidence exists, the final decision of the Commissioner must be affirmed. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. It is the role of the ALJ to resolve evidentiary conflicts, including inconsistences in the evidence. It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423 (d)(2).

The Commissioner applies a five-step sequential evaluation process in assessing DIB. The Commissioner considers, in sequence, whether the claimant: (1)

-16-

has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. § 404.1520(a)(4) (2007). If it is determined at any point in the five-step analysis that the claimant is not disabled, then the inquiry immediately ceases. *See id*; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

The Commissioner's regulations define disability "as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505 (2007). Consequently, if the plaintiff retains the ability to perform work in the national economy, she cannot be classified as disabled.

The ALJ did follow the five-step process in assessing the plaintiff's DIB claim. First, he found that she had not engaged in substantial gainful activity, although she had returned to work for one day on September 18, 2002. (R. at 20.) At the second step, he found that the plaintiff's degenerative disc disease and major depression were both impairments that are considered "severe" within the meaning of the Regulations. (*Id.*) The ALJ indicated that he did consider the claimant's other impairments such

-17-

as knee pain but concluded that "treatment (or lack thereof) has been intermittent at most and such impairments do not significantly limit the claimant's ability to perform work activities." (*Id*.) When considering the third step, the ALJ found that the plaintiff did not "come close to meeting or equaling the criteria for any listed impairment for 12 months as required by law." (R. at 21.)

The ALJ next considered whether the plaintiff retained the residual functional capacity to perform her past relevant work or other work existing in the national economy in significant numbers, the fourth and fifth steps, respectively. In assessing the plaintiff's residual functional capacity, the ALJ considered the plaintiff's subjective testimony but ultimately discredited it. (R. at 22-26.) Consequently, the first issue in this appeal is whether ALJ properly discredited the plaintiff's testimony regarding her pain and its disabling effects.

"Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence . . . ." *Craig v. Chater,* 76 F.3d 585, 595 (4th Cir. 1996); *see* 20 C.F.R. § 404.1529 (2007). Furthermore, it is the role of the ALJ, and not this court, to make credibility determinations. *See Hays*, 907 F.2d at 1456. In short, because ALJs have the opportunity to observe the demeanor and to determine the credibility

-18-

of claimants, ALJ determinations regarding claimants' pain and whether it would prevent the claimants from engaging in any substantial gainful activity are entitled to "great weight." *See Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

After evaluating the plaintiff during the hearing and reviewing the medical records, the ALJ concluded that "[the plaintiff's] allegations of pain and resulting limitations appear exaggerated and are at odds with the other evidence of record." (R. at 23.) In particular, the ALJ found inconsistencies between the plaintiff's alleged limitations and her self-reported activities. He noted that the plaintiff testified that she went camping since her injury and sits in a chair when fishing. The ALJ concluded that "[s]uch activity is contrary to her other testimony that she has difficulty sitting, standing, or walking very long." (R. at 25.) He further listed her numerous activities of daily living and stated that "claimant's allegations of a complete inability to engage in substantial gainful activity due to her impairments are less than credible." (*Id.*) Thus, because the plaintiff's pain allegations are inconsistent with the available evidence, I find that the ALJ properly rejected them.

The plaintiff also contends that the ALJ's residual functional capacity determination is not supported by substantial evidence. After considering all of the plaintiff's symptoms, including pain, the objective medical evidence and other evidence, and the medical opinions of acceptable medical sources that reflect

Case 1:06-cv-00059-JPJ-PMS   Document 20   Filed 09/23/07   Page 19 of 24   Pageid#: 83

judgment on the nature and the severity of the impairments and resulting limitations, the ALJ concluded that the plaintiff retained a residual functional capacity to perform light work. (R. at 15-30.)

The records from Dr. Chand, the plaintiff's first treating orthopedic specialist, support the ALJ's physical residual capacity determination. Dr. Chand first saw the plaintiff in September 2002, shortly after her injury. His treatment consisted of prescribing pain and muscle spasm medication, reviewing MRI results, and recommending physical therapy, acupuncture, an EMG nerve conduction study, and taking time off from her heavy duty job as an ICU nurse. (R. at 166.) On at least three occasions, Dr. Chand opined that the plaintiff could perform light work. (R. at 154, 159, 161.) His opinion is supported by his examinations of the plaintiff that revealed normal neurological function of her legs and no weakness, and by the MRI tests that showed bulging but no spinal canal stinosis or pressure on the nerve roots. (R. at 160, 161, 165.) As the Commissioner correctly argues, the ALJ properly afforded Dr. Chand's opinion significant weight because he was a treating physician and because his opinion was supported by clinical and diagnostic findings. *See* 20 C.F.R. § 404.1527(d)(2), (3) (2007).

The ALJ's determination is also supported by the records of Dr. Schmidt and Dr. Kropac. The ALJ noted, when describing Dr. Schmidt's treatment, that Dr.

Schmidt performed a "thorough" neurological examination on February 3, 2003. (R. at 17.) Following this examination, Dr. Schmidt opined that the plaintiff did not appear to be in acute distress, that her gait and station were unremarkable, and that she had normal strength in the upper and lower extremities. (R. at 142-43.) He diagnosed her with a back strain and recommended another MRI. (*Id.*)

Similarly, the clinical findings of Dr. Kropac, who examined the plaintiff on five occasions, support the ALJ's determination. Dr. Kropac diagnosed the plaintiff with a lumbosacral ligament strain and continued her conservative medical maintenance regiment. (R. at 199-211.) Aggressive treatment or surgery was not recommended. (*Id.*)

There is also substantial evidence supporting the ALJ's assessment that the plaintiff has the mental capacity to perform unskilled work. In particular, the ALJ relied on reports from two examining psychiatrists, Dr. Bizri and Dr. Hasan, and two psychologists, Baker and Terry. Dr. Bizri, Dr. Hasan, and Terry all agreed that the plaintiff had a Global Functioning Score ("GAF") of 55, indicative of moderate functional limitations. (R. at 214, 218, 235.) Dr. Bizri found that the plaintiff's memory and cognition were intact. (R. at 218.) Terry indicated that the plaintiff's depression was likely more related to her change in lifestyle than the pain itself. (R. at 213.) Dr. Hasan also suggested that the plaintiff's mental disorder was related to

-21-

her change in lifestyle and diagnosed her with adjustment disorder secondary to physical illness and situational factors.  (R. at 235.)  He opined that the plaintiff's mental condition was not disabling.  (*Id.*)  Baker's report indicates that she found the plaintiff's mental condition to be more severe, but the plaintiff had not been taking her medication when she was evaluated by Baker.  (R. at 230.)  While Baker concluded that the plaintiff was potentially suicidal (R. at 231), when the plaintiff was taking her prescribed medication, she denied having suicidal thoughts to Dr. Hasan and Dr. Bizri.  (R. at 216, 218, 234).

Finally, the plaintiff claims that the ALJ erred because he relied on a hypothetical question to the vocational expert that did not fairly set out the evidence regarding the plaintiff's impairments.  The plaintiff contends that a different hypothetical question, the last one posed, "did fairly set out all of the plaintiff's impairments and the evidence regarding those impairment was [sic] not contradicted by the evidence of record."  (Pl.'s Mem. Supp. Summ. J. 14.)

In the last hypothetical question, the ALJ asked the vocational expert to consider a hypothetical person the same age as the plaintiff with the same education and background. (R. at 270.)  He also told the vocational expert to consider the same physical limitations that he had previously identified.  But instead of considering the previously identified mental limitations—a moderate limitation in her ability to

understand, remember, and carry out detailed instructions, and to maintain attention and concentration for extended periods—the ALJ directed the vocational expert to assume that this hypothetical person had a mental disorder with restrictions like those identified by McFadden. The vocational expert replied that a hypothetical person with those limitations would be unable to work at any exertional level. (R. at 270.)

In short, the plaintiff is essentially arguing that the ALJ erred in disregarding the opinion of McFadden. However, I find that the ALJ properly evaluated McFadden's opinion. In his opinion, the ALJ noted that he was giving lesser weight to McFadden's opinion because it was not consistent with the rest of the record. (R. at 25.) Indeed her findings contradict those of Dr. Bizri and Dr. Hasan, two licensed psychiatrists. Thus, as the Commissioner correctly argues, because the ALJ properly rejected the opinion of McFadden, the ALJ was not obligated to rely upon the last hypothetical question that was based on the more severe mental limitations identified by McFadden.

I find that the ALJ's residual functional capacity assessment is supported by substantial evidence and that the ALJ properly discredited the plaintiff's subjective allegations and the opinion of McFadden.

IV

      For the foregoing reasons, the plaintiff's motion for summary judgment will be denied, and the Commissioner's motion for summary judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

                                                DATED: September 23, 2007

                                           /s/ JAMES P. JONES
                                           Chief United States District Judge